UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AUBREY HOWARD, | ) | Case No. 08 B 32998 |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |

### MEMORANDUM OPINION

In this matter, Americredit Financial Services, Inc. (Americredit), a creditor, objects to confirmation of a plan filed by the debtor, Aubrey Howard (Howard) in his chapter 13 bankruptcy case. After briefing and a hearing on the matter, the objection is sustained for the reasons stated below.[1]

### I. JURISDICTION

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A),(B), and (O).

### II. BACKGROUND

This dispute centers on whether so-called "negative equity" is subject to the hanging paragraph provision of 11 U.S.C. § 1325(a). The facts for this case are similar to those in most of the other cases that have examined this issue. The following facts are not in dispute.

On September 7, 2007, Debtor Howard, a resident of Chicago, Illinois, purchased a 2007 Chevrolet Trailblazer for $29,798.00. He paid $4,500.00 as a down payment toward the purchase

---

[1] The Court notes that L.R. 5005-3(C) of the Local Rules of the United States Bankruptcy Court was violated by both parties to this matter. The local rule sets a fifteen page limit on briefs filed with the Court. That limit may be disregarded only if the Court grants prior approval. No such relief was granted. L.R. 5005-3(D) allows the judge to either strike the offending document or allow it. In this instance, the Court chose the latter course of action.

of the motor vehicle. To complete the purchase, Howard entered into a sales contract. As part of the transaction, Howard traded in his old car, a 2005 Pontiac, valued at $14,450.00. However, Howard still owed $22,498.68 on the Pontiac, leaving a deficiency of $8,048.68. This deficiency is often referred to as "negative equity," *i.e.*, the amount by which the amount owed exceeds the value of the collateral. The parties entered into a sales contract for the purchase of the motor vehicle, GAP insurance, documentary fee, license fee, title fee, taxes, and the negative equity amount of $8,048.68.

Howard filed for bankruptcy protection under chapter 13 of the Bankruptcy Code on December 3, 2008. Americredit shortly thereafter filed its proof of secured claim in the case for $34,698.07. Howard's proposed plan lists a secured claim for Americredit of $13,250.00, the motor vehicle's current value. The discrepancy lies in Howard's attempt to "cramdown" his plan by bifurcating the claims: treating $13,250.00 as a secured claim and the remainder as an unsecured claim. Americredit contends that its claim cannot be bifurcated in this manner and that it has a purchase-money security interest for the entire amount of its claim.

## III. DISCUSSION

The issue before the Court is whether Howard may bifurcate Americredit's claim and "cramdown" his plan over Americredit's objection. Section 506(a) of the Bankruptcy Code allows bifurcation of loans between their secured and unsecured components. *In re Wright*, 492 F.3d 829, 830 (7th Cir. 2007). The secured component is the collateral's market value; the amount of the claim exceeding that value is the unsecured component which will be paid *pro rata* with other unsecured debt if there are funds in the estate sufficient to pay unsecured claims. *Id.* A debtor in a chapter 13 bankruptcy may retain secured collateral by making monthly payments equal to the market value of

2

the collateral. *Id.* This is a so-called "cramdown" of the debtor's plan, whereby a plan is allowed that substitutes cash for the secured value of the collateral. *Id.*

In response to what it perceived as abuse of the bankruptcy system, particularly regarding motor vehicle financing, Congress amended 11 U.S.C. § 1325(a) in 2005 in the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA). Section 1325(a) now contains the "hanging paragraph" which states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a).

The hanging paragraph of § 1325(a) renders § 506 inapplicable to the purchase of motor vehicles purchased for personal use of the debtor within 910 days of filing a bankruptcy petition. *Wright*, 492 F.3d at 833; *see also In re Sanders*, 403 B.R. 435, 439 (W.D. Tex. 2009) (stating "Bifurcation is thus prohibited where: '(1) the creditor has a purchase money security interest which secures the debt; (2) the debt was incurred within 910 days of the date the petition was filed; (3) the collateral securing the debt is a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor.'" (quoting *In re Busby*, 393 B.R. 443, 448, n. 7 (Bankr. S.D. Miss. 2008))). This means that the entire claim for a motor vehicle is treated as a secured claim because the claim cannot be bifurcated into secured and unsecured components as allowed by § 506. *See Wright*, 492 F.3d at 830 (stating under the hanging paragraph of § 1325, § 506 "does not apply to certain secured loans").

Howard argues that negative equity is not included under the hanging paragraph of § 1325.

Moreover, Howard argues that the hanging paragraph is inapplicable to Americredit's entire claim, asserting that Americredit does not have a purchase-money security interest in the motor vehicle since only the value of the vehicle itself is secured as opposed to the contract price. Alternatively, Howard argues that the transformation rule applies to Americredit's claim, limiting Americredit's claim as a secured, non purchase-money debt. Howard also notes a third possible alternative, the dual-status rule, which provides Americredit with both a purchase-money security interest and a non purchase-money interest in the claim. Conversely, Americredit argues that the negative equity is included in purchase-money security interests for purposes of § 1325. Therefore, Americredit contends that its entire claim should be treated as a purchase-money security interest.

The issue of whether negative equity is included in a creditor's purchase-money security interest in a motor vehicle subject to the hanging paragraph has been litigated heavily since BAPCPA was enacted. During the course of these cases, a split among the courts has emerged. *See In re Graupner*, 537 F.3d 1295, 1300 (11th Cir. 2008) (collecting cases). One camp holds that negative equity is a component of the creditor's purchase-money security interest; the other camp holds that it is not. *Id.* The latter camp is split further on how to treat negative equity in a bankruptcy case. *Id.* Some courts hold that the dual status rule is applicable and applies the hanging paragraph of § 1325(a) to the purchase-money component and treats the remainder as unsecured debt. *Id.* Other courts apply the transformation rule, whereby all of the debt loses its purchase-money status due to the commingling of purchase-money debt with non purchase-money debt. *Id.* Neither the Seventh Circuit nor any court in the Northern District of Illinois has ruled on these issues.

In response to Americredit's objection, Howard argues that Americredit's claim is not for a debt that is a purchase-money security interest, making the hanging paragraph inapplicable to this

4

debt. The term "purchase-money security interest" is not defined by the Bankruptcy Code. *See* 11 U.S.C. § 101. State law determines parties' rights when the Bankruptcy Code does not supply a rule. *Wright*, 492 F.3d at 832 (citing *Butner v. United States*, 440 U.S. 48 (1979)); *but see In re Westfall*, 376 B.R. 210, 220 (N.D. Ohio 2007) (creating a federal definition of purchase-money security interest). Both parties agree that Illinois law, specifically Illinois' version of Article 9 of the Uniform Commercial Code (UCC), must be examined to determine whether Americredit's debt is secured by a purchase-money security interest.

The UCC defines the term "purchase-money security interest" as "[a] security interest in goods is a purchase-money security interest:... to the extent that the goods are purchase-money collateral with respect to that security interest[.]" 810 ILL. COMP. STAT. ANN. § 5/9-103(b)(1). The UCC defines the term "purchase-money collateral" as "goods or software that secures a purchase-money obligation incurred with respect to that collateral[.]" 810 ILL. COMP. STAT. ANN. § 5/9-103(a)(1). "Purchase-money obligation" is defined by the UCC as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." 810 ILL. COMP. STAT. ANN. § 5/9-103(a)(2).

In the present case, Americredit has a purchase-money security interest in the motor vehicle to the extent that the motor vehicle is purchase-money collateral. It is undisputed that the motor vehicle is a good. Howard is the "obligor." He incurred an obligation to Americredit for collateral, the motor vehicle. At issue is whether Americredit's claim falls entirely within the definition "purchase-money obligation" under the UCC, or to put it another way, whether Howard's obligation to Americredit for the negative equity portion of the motor vehicle financing was "incurred as all

5

or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." *Id.*; *see also In re Smith*, 401 B.R. 343, 348 (Bankr. S.D. Ill. 2008).

"Price" is not defined by the UCC. Most courts examining this issue have looked to two sources for a definition of "price." These sources are Comment 3 of the state's applicable UCC section and, in some cases, the particular state's version of its Motor Vehicle Retail Installment Sales Act (MVRISA) or its equivalent. *See, e.g., In re Price*, 562 F.3d 618 (4th Cir. 2009); *Graupner*, 537 F.3d 1295; *Sanders*, 403 B.R. 435 (W.D. Tex. 2009); *In re Callicott*, 396 B.R. 506 (E.D. Mo. 2008); *In re Penrod*, 392 B.R. 835 (B.A.P. 9th Cir. 2008); *In re Hernandez*, 388 B.R. 883 (Bankr. C.D. Ill. 2008); *Smith*, 401 B.R. 343.

Howard contends that "price" as defined under Comment 3 does not include negative equity; Americredit urges that it does. More specifically, Howard argues that negative equity fails to meet the "close nexus between the acquisition of collateral and the secured obligation," as required by Comment 3, for negative equity to be considered a part of a "purchase-money security interest" because the financing of negative equity as part of motor vehicle financing is not integral to acquire a right in the motor vehicle. Comment 3 to § 5/9-103 states:

> Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase money-security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

6

810 ILL. COMP. STAT. ANN. § 5/9-103 (Comment 3).

Howard notes that the term "negative equity" is not specifically included in the definition of price given in Comment 3. Americredit counters by arguing that negative equity falls into the "other similar obligations" language at the end of the first paragraph to the comment. Americredit urges consideration of Illinois' MVRISA.

In Illinois, MVRISA regulates installment sales of motor vehicles. MVRISA defines "cash sale price":

> [T]he price stated in a retail installment contract for which the seller in good faith and in the regular course of business would have sold to the buyer, and the buyer would have bought from the seller, the motor vehicle if the sale had been a sale for cash. The cash sale price may include taxes, registration, certificate of title, license, and cash sales prices for accessories and their installation and for delivering, servicing, repairing or improving the motor vehicle.

815 ILL. COMP. STAT. ANN. § 375/2.6.

"Amount financed" is defined as well:

> [T]he cash sale price of the motor vehicle plus all other charges individually itemized, which are included in the amount financed, including the amount actually paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security interest, lien interest, or lease interest on the property traded in, but which are not a part of the finance charge, minus the amount of the buyer's down payment in money or goods.

815 ILL. COMP. STAT. ANN. § 375/2.8.

The "cash sale price" is the amount paid if the buyer is able to walk in with the necessary cash in hand to complete the purchase of the car. *See Smith*, 401 B.R. at 350. This would include any amount for the sticker price of the car, taxes, additional accessories, or a service contract. *Id.* at 350-51. However, it is common for buyers not to be able to complete the purchase of a motor vehicle for the cash sale price. Financing is often needed to complete the sale. *Id.* at 351. The term "amount financed" is specifically defined by MVRISA and includes "cash sale price" plus costs

involved in financing the money needed to complete the purchase and negative equity. *Id.*

Americredit urges that the UCC be read *in pari materia* with the MVRISA. *In pari materia* means "on the same subject; relating to the same matter." *Smith*, 401 B.R. at 351 (quoting BLACK'S LAW DICTIONARY 352 (2d Pocket Ed. 2001)). The doctrine of *in pari materia* entails "a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." *Id.* (quoting BLACK'S LAW DICTIONARY 352 (2d Pocket Ed.2001)).

The two statutes should be read together. A reading of Illinois' version of the UCC supports this view. Article 9 states that "[a] transaction subject to this Article is subject to any applicable rule of law, statute, or regulation which establishes a different rule for consumers, including:... the Motor Vehicle Retail Installment Sales Act." 810 ILL. COMP. STAT. § 5/9-201(b)(2). The UCC also has the overall purpose and policy "to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties[.]" 810 ILL. COMP. STAT. § 5/1-103(a)(2).

Without financing, many would not be able to purchase a motor vehicle. This is because everybody who wishes to purchase a motor vehicle cannot or wants to pay the entire cash price for the motor vehicle up front. As such, financing becomes crucial in purchasing a motor vehicle. The negative equity in the trade-in vehicle is included in consideration of this financing. *See In re Dunlap*, 383 B.R. 113, 118 (Bankr. E.D. Wis. 2008) ("[T]he debtor and Nissan entered into a single transaction for the purchase and sale of a new car, utilizing negative equity financing as the method to accomplish this goal."). It is true that a buyer may be able to sell his trade-in vehicle through a private sale. However, it is common that motor vehicles are not worth as much as is owed to the lender of the trade-in vehicle. *See Graupner*, 537 F.3d at 1303 (noting that "negative equity trade-in

transactions occurred from 29 to 38 percent of all new vehicle purchases in past years, and that figure seems to be on the rise." (citing Brian J. O'Connor, *At Trade-In, Many Car Buyers are Left with the Upside-Down Blues*, DETROIT NEWS, June 12, 2006; FDIC Supervisory Insights, *The Changing Landscape of Indirect Automobile Lending*, June 23, 2005)). Although it may be an accommodation to the buyer to essentially buy the trade-in vehicle from the buyer, without the trade-in, the sale would not be completed. *See Horne*, 390 B.R. at 199 ("However, the buyers could not have contributed the trade-in vehicle unless the seller also acted to enable the debtor to do so, and the financing of the negative equity was just part of the way that the debtor was enabled to use the trade-in vehicle to acquire a possessory right in, and the use of, the new vehicle."). The buyer would still be responsible for any difference of price and negative equity if the trade-in vehicle were sold through a private sale. *See id.* (stating "the price that the debtors paid for the vehicles at issue includes negative equity because each debtor, as buyers, gave to each seller a trade-in vehicle which would not have, indeed could not have, been accepted for that purpose unless the balance owed on it by the buyer to the third party had been paid off."). The problem of how to resolve the negative equity becomes a part of the entire package. *See Graupner*, 537 F.3d at 1302 (stating "Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle). Without the ability to trade-in one's motor vehicle, many would find it difficult or impracticable to buy an additional motor vehicle because they would have to make payments on two motor vehicles instead of one. The money loaned to pay off the negative equity in the trade-in vehicle is inextricably intertwined and is part of the "value given to enable," under Comment 3, the buyer to obtain ownership rights in the motor vehicle. *See Id.; see also Smith*, 401 B.R. at 354

(adopting other courts' reasoning that money loaned to pay off, *inter alia*, negative equity is part of a "package," is "inextricably intertwined," and is part of the "value given to enable" a buyer to acquire ownership rights in a motor vehicle). There is a close nexus between financing of negative equity and the purchase of the collateral, the motor vehicle.

Negative equity has a close nexus to the "price" of a motor vehicle for purposes of defining a purchase-money obligation secured by purchase-money collateral, creating a purchase-money security interest in Americredit's claim under the UCC. Howard may not bifurcate Americredit's claim; there is a purchase-money security interest in the full amount of the claim. This ruling precludes a decision on whether negative equity in a motor vehicle claim under the hanging paragraph of § 1325(a) is subject to the transformation rule, which transforms the claim to a secured non purchase-money debt, or the dual status rule, which splits the claim into purchase-money and non purchase-money components.

## IV. CONCLUSION

For the foregoing reasons, Americredit's objection to confirmation of Howard's proposed plan is SUSTAINED.

DATED: June 16, 2009                    ENTER:

                                        */s/ Jacqueline P. Cox*
                                        _____
                                        Jacqueline P. Cox
                                        United States Bankruptcy Judge